Oh yes, oh yes, oh yes. The Honorable Health Department of the District of St. Louis is now in session. Please be seated. Good morning everyone. Glad we all made it through the storms. We are reconvened after a brief recess from yesterday. The first matter on the docket is 5-25-0671. Kimberly Falconer v. East St. Louis School District No. 189. Attorney for the appellant, Mr. Dahl. And Mr., is it Sudekun? Sudekun, sorry. And then for the appellant, Mr. Horner? Yes, ma'am. Are you all ready and prepared? Yes, ma'am. Alright, you may approach. And again, would you please state your name for the record when you get to the podium. Thank you. Good morning. I'm Randy Dahr for the appellant. And my co-counsel is Michael Sudekun. May it please the court, counsel. We are here today representing the estate of Jermaine Falconer. And we seek reversal of the trial court summary judgment order of August 11, 2025. It's a difficult review by this court for two reasons. One, it's a summary judgment order. But B, the heart of the matter involves interpretation of a statute and application of a statute. So under both scenarios or both circumstances, there would be a de novo standard of review. It is the appellant's contention that the trial court engaged in several levels of reversible error. And I'm going to address that specifically here in a second. But what I think is the linchpin or one of the linchpins of this case in our argument is the difference between a dysrhythmia, a cardiac dysrhythmia, and a heart attack. And I think those are cardiac infarction. And that's where I think the court has been confused at the trial court level. A dysrhythmia is where the heart is pumping, but it is in a scattered manner. And there can be several types of dysrhythmia. But what happens is when that heart starts to engage in an erratic rhythm, it doesn't profuse enough blood to the system. So then you have poorly oxygenated vital organs, in particular the brain. And that's what causes that. As opposed to a cardiac infarction, which is the stoppage of the heart because of the blockage or stenosis. An AED functions to put a dysrhythmic heart back into a profusing rhythm or back into a profusing state. An AED does not start a non-functioning heart. So if you have a heart that is completely stopped, the AED is not going to start that heart. There are other methods, you can do CPR and things along those lines, but the AED is not going to do that. And in fact, an AED does not concern itself with the heart rate of the student or the class person. The AED is just evaluating the rhythmic state of that heart or the heart rhythm. Counsel, the deceased had a pulse. It was reported he had a pulse. And he was breathing, right? He was breathing. So this is all AED. The instructions say if they've got a pulse in their breathing, don't use the AED, right? Well, that's what those pulses said. There were some literature that they did. There was no foundation that anyone relied on that literature. That's what they pulled up before. But that is also incorrect. And that is borne out by the expert testimony in this case. That when you have a collapsed person who is non-responsive, you apply the AED. And the AED, that's why the legislature said that the AED has to be kept in automatic form. That's the whole point of an AED. It is automatic. It does not require the evaluation by the monitor of the physical activity. All you do is you apply it. And then the AED itself will either discharge or prompt the individual to discharge or administer the shot. But, Mr. Dar, you relied heavily on the Dawkins case, correct?  In that case, the victim there had detectable, did not have the detectable vital signs, though, correct? And was not in the same situation as the victim in this case, correct? As the decedent in this case. Well, I don't know what... It's distinguishable. I'm asking, what do you say to the fact that it's distinguishable? Well, I think everybody, when I say everybody, the two cardiologists and the sports management expert all said the same thing. That trying to determine whether an individual in the field has a pulse is highly unreliable. So, the fact that he may or may not have a pulse isn't a reassuring factor for anybody who's dealing with a collapsed, non-responsive athlete. That's why you always put on the AED. The AED will not hurt the student, will not hurt the athlete. That, it is automatic. It reads the rhythms of the heart. He could theoretically be in a dysrhythmia that it doesn't shock for whatever reason. Because he feels it's a perfusing thing. But that is for the AED to determine. But he also may have a pulse which, in the field, due to lack of training or just because of the condition of the student, they can't detect the pulse. That doesn't mean it doesn't exist. That doesn't mean that because they can't detect the pulse that he is fine and that he is having a perfusing pulse. That's the difference. There's a difference between a perfusing pulse and a pulse. And if you have a non-perfusing pulse, you have a fatal situation which is going to result in death. And we know in this case, Jermaine Falconer's case, that he had a non-perfusing pulse. The way we know that for certain is because when the ambulance crew arrived, they put on the pulse oximeter and it registered 80%. Dr. Falconer, I mean Dr. Beavers testified that establishes that his arterial oxygen levels were below 50%. Dr. Stein, the defense attorney, agreed that that was a reading showing this man was being oxygen deprived and oxygen starved. So we know whether he had a pulse that was detectable or not detectable, he did not have a perfusing pulse. Because if he had a perfusing pulse, that oximeter reading would not be 80% or below and his arterial blood flow, his arterial oxygen levels would be much higher. So whether he had a pulse or not a pulse is truly a red herring and it's not a reassuring sign under any circumstance. And the other thing that, and that's what the trial court error, because the court made a finding that he was not a candidate for AED. And at a minimum, that's a disputed fact. The evidence in this case is that if you have a collapsed non-responsive athlete, you always put on the AED and let the AED make the choice. I think the trial court got caught up in the fact that these people in the field and the evidence group, to his credit, said that they had a detectable pulse and they wrote it down. That was a reassuring sign, as I said before, because we know of the oxygen levels. But what we do know is that from approximately 4.03 until he left at 4.18, no one attempted to do any type of intervention. All they did, and you have the video, but no one disputes this. They just watched him. I'm sure they said comforting words to him, but they didn't do anything with the AED. There's a big dispute in the record as to whether they had an AED. Coach Sunkett said the AED was locked away in a different room. There was other testimony. Coach Hawthorne thought that maybe the AED was on the wall. We don't know for sure, but it's a disputed issue. But also, the most important or salient fact was nobody did anything. They did immediately, within a split second, call. Immediately, there was a call within a split second for medical attention. Well, I think the call came about three minutes later after the collapse. But I think that that's not enough. Under the AED, it's not enough. And under the Dawkins opinion, it's not enough. Because Dawkins says it's not enough to have an AED or to go through a class when the circumstances warrant you need to apply an AED. You need to use the AED. And when do the circumstances warrant, I think is the question, that basic question. Right. When the circumstances warrant. But that's a proximity cause question, and that's a fact question. And under summary judgment, that should have never been decided by the trial court. Well, to put it simply, isn't an AED supposed to shock a non-beating heart? No. An AED shocks a non-perfusing rhythm. So, when you have a dysrhythmia or an erratic heart rate, it will shock you back into a perfusing or a consistent rhythm. But it will not take your flatline heart and restart it. That's what it does not do. And Dr. Beavers said that very clearly. And that's why I believe Dr. Stein agrees with that principle also. There are other methods to restart a heart, but the AED is not that feature. The AED, and the statute, the AED statute clearly defines what an AED does. And it is to monitor and recognize the ventricular fibrillation and the ventricular tachycardia, which are irregular heart rates. It does not, and it doesn't, it doesn't determine whether there's a heart rate. It determines the nature of the rhythm of the heart. That's why I say having a pulse is not a reassuring sign. And there's no way as a layman that you can watch, you can look at a collapsed gentleman on the ground and decide what his heart rhythm is like. You just can't. And that's why you have the AED. It's automatic, it's external, and it needs to be left in the automatic mode. And the training would involve making sure that those people monitoring have these basic concepts, which are apply the AED, call for help, apply the AED, and then let it do its course. And that's what they should have done. And had they done that, the evidence for Dr. Beavers is he had up to an 87% chance of surviving this dyslipidemia condition. And with every passing minute, that decreased by about 10%. So had they moved promptly, it wasn't enough just to call 911. In this case, we know that 911 didn't get there until 15 minutes later. Well, 15 minutes later, with a non-perfusing condition, you're probably brain dead. Because your body was being, I mean, we don't know how much blood he was getting. We know that he was being oxygen starved. We don't know how long he could have stayed in that condition. But we know he would have, you know, if they would have applied the AED within 10 minutes, he would have been fine. Or likely would have been fine. So, and we just think that there were, one other point I just wanted to make. Under the statute, we believe that the, the Tort Immunity Act has no application. If you apply the Tort Immunity Act, then you've rendered the AED Act and the Physical Fitness Facilities Act meaningless. Because they specifically apply to public entities and public schools. And if you wanted to apply that, you're making that language unnecessary. Or, you know, unwarranted or meaningless. Because you're taking, you're giving them blanket protection. If you apply 105 and 106, which is absolute immunity, as the trial court found. But also, in this case, under the statute, if they don't have a safety plan in place and filed with the Illinois Department of Public Health, they're responsible for simple negligence. And the court did not fight on to that argument. That the statute says you've got to have an emergency response plan and you've got to file with the Department of Public Health. There's no question that was not done in this case. Any further questions? Any questions? No, thank you. Alright. You'll have time to go back as well. Thank you very much. Alright. Mr. Horner? Good morning, Your Honors. May I please the court, counsel? My name is Garrett Horner and I represent the defendant, L.O.D., East Saint Louis School District 189 in this case. I'd like to begin by addressing some of the comments from counsel in his opening presentation. I think it is important to note that the Zol 80D plus that was used in this case is not an automatic shock. It does not automatically shock the victim when the shockable rhythm is detected. Rather, the Zol 80D plus requires the user to press a button if and when the shockable rhythm is detected. I think it's also important to note that, as you would expect, the 80D, the Zol 80D plus comes with a manufacturer's manual that provides instructions for the use. And it's very clear in this case that the Zol 80D plus manual provides that users should use the 80D when a suspected cardiac arrest victim has an apparent lack of circulation as indicated by unconsciousness and absence of normal breathing. Mr. Horner, you agree there was no training on this defendant later, is that correct? No, this particular instance, Terry Hawthorne was trained. He had the training that's required by the AED Act. He was the first one who came to their care. But there was no safety plan? There was not a safety plan, but it's the district's position that a safety plan would not have changed how they reacted. So I think that's the real red herring in this case. In the absence of the safety plan, what did the district do? They immediately checked vital signs. They contacted within less than two minutes, contacted 911. And then they went within the school. There's a Southern Illinois Healthcare Foundation clinic. They went and got the medical assistance, and they all took their vitals. They all took vitals of the decedent, and none of them determined that the AED should be used. Am I correct? The EMTs did not use an AED, is that correct? That's correct. When the EMTs arrived, one EMT did testify that he knew there was an AED on the wall. But Mr. Hawthorne, the district employee, the medical assistance, and the EMTs all testified that they did not use the AED because there was a detectable pulse, and the decedent was breathing at the time. Is it clear that there was an AED machine in this room hanging on a wall or not? Yes, there was one in this room, and this weight room is part of the larger high school. And the record reflects that there are, I believe, eight AEDs within the building. Counsel, I'm bothered by the existence of this expert testimony. Doesn't that create an issue for the trier effect? No, in this case, it doesn't create an issue of the trier effect because it simply cannot be said that following the instructions of the AED would somehow be willful and wanton or even negligent conduct. I mean, in this case, when it comes to willful and wanton, there isn't a conscious disregard for the welfare of the decedent. There's a conscious regard for it because they took the vital signs, they established that the vital signs were there and did not warrant the use of the AED, irrespective of the expert testimony, and that's really why the court didn't need to rely on the expert testimony. And I think case law here in Illinois indicates that you can't create a question of fact simply with the testimony of experts, but here it's not necessary. What about plaintiff's reliance on the Dawkins case? So I think that the Dawkins is distinguishable factually because in the Dawkins case, there was no discernible pulse. There was, I want to make sure I put this correctly, it notes at the outset that when she collapsed, she had stopped breathing, lost her pulse and circulation. That's not the case here. In fact, in Dawkins, what Dawkins does for the defendant's position is it also indicates in the complaint that the allegations were that there was not an assessment made of breathing. There was not an assessment made of the loss of pulse. There was an assessment made of circulation. In this case, there was an assessment made of those factors by Terry Hawthorne, the district's coach employee, by the medical assistants who came, by the EMTs. And it's noteworthy that at the time the EMTs were transporting the decedent to the hospital. So after the district is no longer in the picture, he's no longer on district property, they took the vital signs and established that the decedent had a blood pressure of 130 over 76, a pulse of 120, and respirations of 8 breaths a minute. So after he had departed the district's property and the district's care, he had those vital signs, and then the EMT didn't use the AED. I would note another important thing with Dawkins is the Physical Fitness Act that's relied upon. Dawkins established that there can be a private cause of action under a private right of action under that act. Not under the AED Act, but under that act. If you look at that act on the Immunity Provision, Section 45 of the Physical Fitness Facility Medical Emergency Preparedness Act, it opens by saying, Nothing in this act shall be construed to either limit or expand the exemptions from civil liability in connection with the purchase or use of an automated external defibrillator that are provided for under the Automated External Defibrillator Act or under any other provisional law. So it qualifies as immunity that you need to read other provisions of law together. Imperia Materia and what other provision of law provides immunity, potentially in this case, is the Tort Immunity Act. So it leaves the door open for the application of the Tort Immunity Act or any other provision of law. So it doesn't supplant the Tort Immunity Act. What about their argument that the AED is more specific and it's later than Tort Immunity, so therefore Tort Immunity doesn't apply? So first, I would say from a specificity standpoint, the Physical Fitness Preparedness Act applies to anybody who operates a physical fitness facility. That's not just public entities. That's private entities. So when you look at additional specificity, the Tort Immunity Act is arguably more specific because it only applies to public entities. But also, this act says that it does not limit or expand other existing immunities. So you have to read it together. In the Tort Immunity Act, it would still be viable and it would still apply to local governments. And this provision is 2005, which is later than the AED Act. So when the legislature provided this exemption, and it also provided the qualification that it's not going to affect any other immunities available, they did so with full knowledge of these other acts. So again, under that first sentence, regardless of whether or not Section 45's immunity applies due to a lack of an emergency plan, it does not affect the application of the Tort Immunity Act. So again, for the reasons I indicated before, I don't consider the pulse to be a red herring. Dockings consider the pulse to be significant, or lack thereof. So that's the assessment that's required to be made. And everyone down the road until the seat reached the hospital made that assessment and did not use the AED. So in this particular case, and for those reasons, I think that the circuit court was correct in determining that there was no proximate cause to the injuries. The injuries were actually caused in the unfortunate death caused by an underlying medical condition that was never exposed to the district. It wouldn't have had any reason to be aware of it. With respect to the lost chance of survival argument that's being made, it cites two cases where the Supreme Court said that the lost chance of survival is available in medical malpractice cases. This, of course, is not a medical malpractice case. It wasn't pled as one. There wasn't procedural requirements met for a medical malpractice case. So in this case, the lost chance of survival would not apply anyway. But again, based upon the district's actions, its conduct, its compliance with the manual, there wouldn't be any proximate cause anyway. And finally, there is a provision that is cited in the brief for the first time that was not addressed in the trial court, and that is the application of 3-109 of the Tort Immunity Act citing the case of Murray v. Chicago Youth Council. Now, procedurally, the application of 3-109 would be waived because it's raised for the first time on appeal. But even so, subsequently, this case does not involve ultra-hazardous activity. This case involves conditioning, cardiovascular, non-contact types of activity that would not implicate Section 3-109. But the Murray case, what's significant about that is it says that in that particular case, that involved trampolines. Now, trampolines are expressly identified as ultra-hazardous under 3-109. But again, what we have here is not either expressly or impliedly ultra-hazardous under 3-109. But in Murray, it said that if 3-109 did not apply, then the absolute immunity under 2-201 and 3-108 does. So Murray actually supports the district's argument that the application of 2-201 and 3-108 absolutely immunized the district. And finally, there was something referenced in the brief disputing the application of the 1-210 definition of willful allotment within the Tort Immunity Act. Excuse me. The Murray case says specifically that the definition in 1-210 of the Tort Immunity Act is consistent with the common law definition of willful allotment. So I think in that case, that argument draws a distinction without a difference. Regardless of which standard you apply, it's going to be consistent, if not the same. So for those reasons, in those reasons set forth in the brief, Defendant Appellate East St. Louis School District No. 189 respectfully requests that this Court affirm the summary judgment ended by the Circuit Court. Thank you. Just... Mr. Garre, I'm going to start with a question, if I can. Sure. You had stated earlier that there was a discrepancy in the record about whether there was an AED on site, I think you said. Correct. But the Court, in their order, said here the record is clear that the district had an AED in the weight room and said the AED was maintained on an annual basis. Where is the...point me to the discrepancy. Sure. If you look at Coach Sunken's testimony, who is the athletic director and the head coach for the football team, he testified unequivocally that the AED was locked in a trainer's office and he did not know if it was maintained or kept charged. That's in our brief and we excerpted it in the Statement of Facts. But Coach Sunken said that explicitly. And my recollection of Terry Hawthorne's was that he felt it was on the wall. When we did our site inspection, I will concede that they had one on the wall. But since that time, and Coach Sunken said they brought in, after this fact, they brought in somebody to create a safety plan, a physical response plan, because they had none, and to deal with these AED issues. Because what happened in this case was they had a trainer, and the trainer had an office, and the trainer, according to Coach Sunken, had the AED locked in her trainer's room at the time of this accident. It was in a bag, a bag AED. How do you respond to their proximate cause argument? I'm not sure that I know. About him having a pulse in the ambulance? Well, they claim he failed to establish proximate cause. In fact, so did the trial court. Well, certainly there was a failure to abide by the statute, act reasonably under the circumstances, to provide Jermaine the opportunity to survive. But more importantly, Dr. Beavers and Dr. Stiger both testified that his chance of living was 89%. Dr. Beavers said it was 89%, as high as 89%, but certainly greater than 50% is what he testified to, and that's in the records. Dr. Stiger also testified that early intervention is the key to successful revival, because it's 10% diminished chance with every passing minute. So we certainly met the threshold for proximate cause to make that a fact question for the jury to decide. The only other thing I would point out is he testified, or the counsel pointed out, that the ambulance crew recorded blood pressure and a pulse while he was in the ambulance. Once again, I think that just gets back to proximate cause in our favor, that this was a survivable event had there been proper intervention and quick intervention. And I think what's also important to keep in mind, which is in the record, agreed to by Dr. Stein, their attorney, and our attorneys, was that when you have this dysrhythmic condition, you can have intermittent pulses and activity. So what happens is, because it is a chaotic cardiac event, it fluctuates, and that's the problem. It's not perfusing blood, it's not pumping on a normal rate. So you can have, if you and Dr. Dean testified, you can be checking the guy's pulse at one moment, and it can be, you can't detect one, you can detect one a few minutes later, you may have a blood pressure a few minutes later, you may have no blood pressure. That has to deal with the consistency of the rhythm of the heart. It doesn't have anything to do with the heart pumping. It's the rhythm of the heart that is allowing the blood to circulate, or to perfuse. But at the time that he was transferred into the ambulance, what was his blood pressure, 120 over 70? I can't recall exactly what the numbers were, but they reported a blood pressure. But that, once again, that would not indicate proximate cause, because, once again, it's the lack of oxygen to the brain, because you're not perfusing, it's not the heart. So that's what kills the patient. It's not that the heart stops functioning right away, it's that the brain is brain damaged and dead. And then, eventually, you're going to have a stoppage of other vital organs. But he could have been brain dead in the ambulance and still had a blood pressure. Just because he had been so oxygen deprived that he wasn't going to be able to function again at a meaningful level, still doesn't mean that his brain, I mean, all of his vital organs had quit functioning. I mean, I don't remember if this guy was a donor or not, but, I mean, the death of some organs doesn't mean the death of all organs. They don't all die at the same time. Any further questions? No questions, thank you. All right, thank you both very much. We will take this matter under advisement. We will issue a ruling in due course. Enjoy the rest of your day. Thank you very much.